1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**

9 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10 **WESTERN DIVISION**

11 | | |
| --- | --- |
| **In the Matter of the Extradition of** ) | **No. CV 06-05092 MMM (AJW)** |

11 **In the Matter of the**                          )          **No. CV 06-05092 MMM (AJW)**
**Extradition of**                                     )
12                                                            )          **MEMORANDUM AND ORDER**
**JOSE LUIS MUNOZ SANTOS,**            )          **CERTIFYING EXTRADITABILITY**
13                                                            )
**A Fugitive from the Government**         )
14 **of the United Mexican States.**           )
                                                            )
15                                                            )
                                                            )
16                                                            )
                                                            )
17 _____ )

18                                              **Introduction**

19            The United Mexican States ("Mexico") has requested the extradition of Jose Luis Munoz

20 Santos, aka "El Pepe Munoz," aka "El Patillas," aka "Jose Luis Hernandez Santos" ("Munoz"[1]),

21 pursuant to the Extradition Treaty between the United States of America ("United States" or

22 "government") and Mexico, signed at Mexico City on May 4, 1978 ("Extradition Treaty"), and

23 entered into force January 25, 1980. See T.I.A.S. No. 9656, 31 U.S.T. 5059, 1980 WL 309106 (Jan.

24 25, 1980). The court has considered the extensive record compiled in this case and the legal

25 arguments made by counsel during the April 19, 2011 extradition hearing.

26

27 _____

28            [1]  Jose Luis Munoz Santos is referred to as "Munoz" to be consistent with the naming
convention used in Munoz's opposition to the extradition request.

Following the filing of a complaint ("Complaint") and the issuance of a provisional arrest warrant on May 12, 2006, Munoz was arrested in the United States on May 17, 2006.[2] The government subsequently filed Mexico's formal request for extradition, with supporting documentation. [Filing of Redacted Formal Extradition Papers and Request for Extradition filed August 15, 2006, Docket No. 10 (cited as "Formal Papers" in text, "FP" in citations)]. The government originally requested Munoz's extradition to Mexico to face charges of kidnapping and homicide arising from his alleged involvement in the kidnapping of Dignora Hermosillo Garcia ("Hermosillo") and her two minor daughters, K.C.H. and C.J.C.H., on or about August 18, 2005, and the homicide of C.J.C.H. [FP at 0001-0002; Government's Extradition Memorandum filed May 14, 2010, Docket No. 124 ("Extradition Mem.") at 2; Notice of Filing of Diplomatic Note No. 05059 and Declaration of Haydee Chavez Sanchez filed Nov. 3, 2009, Docket No. 112 (redacted copy; original under seal)].

Subsequent legal proceedings in Mexico narrowed the charge against Munoz to kidnapping only. On September 4, 2007, a Mexican criminal court issued a superseding warrant for Munoz's arrest on the charge of kidnapping Hermosillo and her two daughters (the "Warrant"). At Mexico's behest, the government filed supplemental papers seeking the extradition of Munoz to Mexico to face the kidnapping charge. [See Extradition Mem. 3; Government's Filing of Supplemental Formal Extradition Papers and Affidavit of Haydee Chavez Sanchez filed May 14, 2010, Docket No. 126 (redacted, English-only copy; original under seal) ("2010 Supp. FP") at 4-9; Notice of Filing of Diplomatic Notes Nos. 05454 and 09613, filed April 13, 2010, Docket No. 123, at Exhibit ("Ex.") D; Government's Filing of Supplemental Formal Extradition Papers, filed March 12, 2009, Docket No. 79 ("2009 Supp. FP") (redacted copy; original under seal) at 8-34].

Munoz filed an opposition to the extradition request with supporting exhibits. [See Opposition ("Opp.") and Exhibits filed June 3, 2010, Docket Nos. 141-145 (under seal)]. The

---

[2] On December 21, 2006, Munoz's motion for release on bond was granted, and he was released with bond conditions on December 28, 2006. See In re Extradition of Santos, 473 F.Supp.2d 1030 (C.D. Cal. 2006).

government filed a reply memorandum on June 8, 2010 ("Gov. Reply"), and Munoz filed a sur-reply under seal on June 9, 2010.

On February 16, 2011, an order was filed denying Munoz's request to call witnesses and present oral testimony during the extradition hearing.

## Discussion

### Standard for Certification of Extraditability

Extradition from the United States is governed by 18 U.S.C. section 3184, which confers jurisdiction on "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State.[3] 18 U.S.C. § 3184; see Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1009 (9th Cir. 2000).[4]

To obtain a certification of extraditability on behalf of a requesting state, the United States has the burden of demonstrating each of the following elements: (1) the court possesses subject matter jurisdiction to conduct extradition proceedings; (2) the court possesses personal jurisdiction over the person named in the extradition request; (3) a valid extradition treaty exists between the requesting state and the United States; (4) the extradition treaty between the requesting state and the United States is, and at all relevant times has been, in full force and effect; (5) the person named in the extradition request is charged with having committed a criminal offense within the jurisdiction of the requesting state; (6) the charged offense is extraditable under the relevant

---

[3] Within the Central District of California, magistrate judges are authorized by general order to preside over extradition proceedings. See C.D. Cal. Gen. Ord. 05-07.

[4] The holding in Cornejo-Barreto was disapproved of by Cornejo-Barreto v. Seifert, 379 F.3d 1075 (9th Cir. 2004) ("Cornejo-Barreto II"). Subsequently, however, the Ninth Circuit, sitting en banc, vacated Cornejo-Barreto II and denied a request to vacate the published opinion in Cornejo-Barreto, which therefore remains good law. See Cornejo-Barreto v. Seifert, 389 F.3d 1307 (9th Cir. 2004) (en banc).

3

extradition treaty (that is, the offense charged falls within the terms of the relevant extradition treaty); (7) the person named in the extradition request is the person arrested and brought before the court; and (8) there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense. See 18 U.S.C. §§ 3184, 3190; Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Prasoprat v. Benov, 421 F.3d 1009, 1013 (9th Cir. 2005), cert. denied, 546 U.S. 1009 (2006); Cornejo-Barreto, 218 F.3d at 1009-1010; Quinn v. Robinson, 783 F.2d 776, 782-783 (9th Cir.), cert. denied, 479 U.S. 882 (1986). "Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses." Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 14 (1936).

During the extradition hearing, Munoz's counsel stipulated that all elements except the element of probable cause have been satisfied. [See Transcript of April 19, 2011 Extradition Hearing ("Extradition Hearing Transcript") at 5-6]. Accordingly, the only disputed issue is whether the record contains competent evidence establishing probable cause to believe that Munoz committed the charged offense of kidnapping.

**Authentication requirement**

The admissibility of evidence in extradition proceedings is governed by "the general extradition law of the United States and the provisions of the" Extradition Treaty. Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1450 (9th Cir. 1987); accord, Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988). "The authentication requirements for documentary evidence are contained in 18 U.S.C. § 3190, which specifies that 'the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that submitted documents are authenticated in the manner required.'" Barapind v. Enomoto, 400 F.3d 744, 748 (9th Cir. 2005) (en banc) (per curiam); see Bingham v. Bradley, 241 U.S. 511, 517 (1916) (holding

that documentary evidence that was "properly authenticated in accordance with" the predecessor provision to section 3190 was "competent" and "sufficient" to establish probable cause).

The Extradition Treaty states that the documents "accompany[ing] the request for extradition, shall be received in evidence when: . . . b) In the case of a request emanating from the United Mexican States, they are certified by the principle [sic] diplomatic or consular officer of the United States in Mexico." Extradition Treaty, art. 10, § 6. The Extradition Treaty imposes no supplementary authentication requirements or other requirements for the admissibility of documentary evidence.

The Federal Rules of Evidence do not apply in extradition hearings. Then v. Melendez, 92 F.3d 851, 855 (9th Cir. 1996); Oen Yin-Choy, 858 F.2d at 1406. Thus, for example, hearsay evidence is admissible, as are unsigned translations of a witness's statements and unsworn statements of absent witnesses, provided the evidence is properly authenticated and—as is true in this case—the governing extradition treaty does not require that witness statements be executed under oath. See Collins v. Loisel, 259 U.S. 309, 317 (1922); Barapind, 400 F.3d at 748; Then, 92 F.3d at 855; In re Requested Extradition of Smyth, 61 F.3d 711, 720-721 (9th Cir.), as amended by 73 F.3d 887 (9th Cir.1995), cert. denied, 518 U.S. 1022 (1996); Emami, 834 F.2d at 1451-1452; Quinn, 783 F.2d at 815; Zanazanian v. United States, 729 F.2d 624, 626-628 (9th Cir. 1984).

Munoz does not challenge the authentication of any of the government's evidence. That evidence was contained in various filings accompanied by certificates with ribbons and seals signed by the then-current principal consular officer, the "Minister Counselor of Consular Affairs" of the United States at Mexico City, Mexico, attesting that the annexed documents were "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of the United Mexican States." [See FP 25, 78; 2010 Supp. FP 4; 2009 Supp. FP 5]. Accordingly, the government's evidence is admissible for purposes of establishing probable cause.

5

Munoz, however, contends that the government's evidence substantively fails to establish probable cause. Munoz further argues that even if the government's probable cause showing is deemed sufficient, additional evidence offered by Munoz is admissible and "obliterates" the government's evidence of probable cause.

**Probable cause standard**

The Extradition Treaty states that an "extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party." Extradition Treaty, art. 3. This provision "requires extradition under the [Extradition] Treaty to be based on competent evidence that would be sufficient to establish probable cause to hold a defendant for trial under United States law." Wang v. Masaitis, 316 F.Supp.2d 891, 898 (C.D. Cal. 2004) (construing nearly identical treaty language) (quoting Emami, 834 F.2d at 1447); see Barapind, 400 F.3d at 747 ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes.") (citing Quinn, 783 F.2d at 783; Cornejo-Barreto, 218 F.3d at 1009); see also 18 U.S.C. § 3184; Mainero v. Gregg, 164 F.3d 1199, 1205 (9th Cir. 1999) (stating that the record must "contain[] competent evidence to support the conclusion that there was probable cause to believe the petitioner guilty") (quoting Zanazanian, 729 F.2d at 626), superseded by statute on other grounds as stated in Cornejo-Barreto, 218 F.3d at 1009 n.5.

Under federal law, probable cause "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." Rodis v. City, County of San Francisco, 558 F.3d 964, 969 (9th Cir. 2009) (quoting United States v. Lopez, 482 F.3d 1067, 1072

6

(9th Cir. 2007)).  "The probable cause standard is incapable of precise definition or quantification into percentages" and is a "fluid concept" because it "depends on the totality of the circumstances" and "turn[s] on the assessment of probabilities in particular factual contexts . . . ." Rodis, 558 F.3d at 969 (citations omitted).

"The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Collins, 259 U.S. at 316. "The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." Quinn, 783 F.2d at 815; accord, Barapind, 400 F.3d at 750, 752. Thus, "[a]n extradition proceeding is not a trial . . . ." Emami, 834 F.2d at 1452 (citing Charlton v. Kelly, 229 U.S. 447, 461 (1913)); see Quinn, 783 F.2d at 817 n.41 (noting the "well-established rule that extradition proceedings are not to be converted into a dress rehearsal for trial") (quoting Jhirad v. Farrandina, 526 F.2d 478, 484 (2d Cir.), cert. denied, 429 U.S. 833 (1976)); see also Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003) ("American judicial officers conduct a circumscribed inquiry in extradition cases.").  "If the evidence is sufficient to sustain the charge, the inquiring magistrate judge is required to certify the individual as extraditable to the Secretary of State and to issue a warrant." Blaxland, 323 F.3d at 1208 (citing Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir. 1997)).

Although the federal probable cause standard applies, the probable cause finding need not be "predicated upon evidence that would be admissible at a preliminary hearing or before a grand jury in the United States." Zanazanian, 729 F.2d at 626 (citing Collins, 259 U.S. at 317). The magistrate judge's function is "to determine whether there is 'any' evidence sufficient to establish reasonable or probable cause." United States ex rel. Sakaguchi v. Kaulukukui, 520 F.2d 726, 730-

7

731 (9th Cir. 1975); see Cleugh v. Strakosch, 109 F.2d 330, 333 (9th Cir. 1940) (stating, in an extradition case, that "the sole question was, and is, whether there was any evidence warranting the finding that there was reasonable or probable cause to believe appellee guilty—not whether such evidence was sufficient, but whether there was any such evidence").

**Government's evidence in support of probable cause**

To establish probable cause, the government relies exclusively on the statements of several witnesses, translations of which are attached to the Formal Papers or the Warrant:

> (1)  Statement of Hermosillo [see Extradition Mem. 4-6 & Ex. 2 at 43; FP 250-253, 264, 269-270, 324-328];
>
> (2)  Statement of Benigno Andrade Hernandez ("Andrade") [see Extradition Mem. 6 & Ex. 2 at 50-52, 57-58; FP 202-204, 321-323];
>
> (3)  Statement of Jesus Servando Hurtado Osuna ("Hurtado") [see Extradition Mem. 6-7 & Ex. 2 at 59, 65-66; FP 214-225];
>
> (4)  Statement of Roberto Castellanos Meza ("Castellanos") [see Extradition Mem. 7-8 & Ex. 2 at 47-50; FP 320-321]; and
>
> (5)  Statement of Fausto Librado Rosas Alfaro ("Rosas") [see Extradition Mem.8-11; FP 354-357].

These statements are summarized below in chronological order.

**Statement of Castellanos**

On August 21, 2005, Castellanos voluntarily gave a statement to the Public Prosecutor's Office for the purpose of filing a complaint. [See Extradition Mem. 7-8 & Ex. 2 at 47-50; FP 320-321]. He said that he was a storekeeper and a partner in a shrimp farm. He was the husband of Hermosillo and the father of C.J.C.H. and K.C.H. [FP 320]. On August 18, 2005, at about 3 p.m., Castellanos told Hermosillo that he would drop their daughters off at her mother's house, where

8

she was to pick them up after an appointment.  At about 9 p.m., Castellanos received a call on his cell phone from his wife's cell phone number, but he got cut off when he tried to answer. When he tried calling his wife back, she did not answer, and he thought she might be mad at him. [FP 320]. At about 10:30 p.m., Castellanos's brother, Juan Carlos Casteneda Meza, phoned him to let him know that he had passed Castellanos's house, and that the garage door was open and there was no vehicle in the garage. [FP 321]. At that point Castellanos began to worry. [FP 321]. He called his father-in-law's house to say he did not know where his wife and daughters were, and he tried unsuccessfully to locate them.

At around 6:30 a.m. the following day, August 19, 2005, Castellanos received a call from Hermosillo. She told him to come pick her up in the town of Jolotemba. [FP 321].

**Statement of Hermosillo**

On August 29, 2005,[5] eleven days after her kidnapping, Hermosillo voluntarily appeared before a Deputy District Attorney in Tepic, in the state of Nayarit, Mexico and gave a sworn statement.[6]

---

[5] The government says that Hermosillo gave her statement on August 19, 2005, one day after her kidnapping, but the copies of her statement contained in the Formal Papers are dated August 29, 2005. [See FP 157, 324, 655].

[6] The preface to Hermosillo's transcribed statement says that she was

*sworn* under the terms of Articles 232 and 233 of the Nayarit State Criminal Procedures Code[:] to tell the truth in the proceedings in which she will participate and advised of the penalties that may be imposed on persons that declare false statements before any authority other than a court authority in the performance of their duties or by reason of same, as stipulated by the terms of Article 246 section I, of the Nayarit State Criminal Code, which states *" . . . A sentence of between two months and three years in prison and a fine of between one and ten days minimum salary shall be imposed on: I.- Any person that, when questioned by any public authority other than a court authority, in the performance of their duties or by reason of same, declares false statements[.]"*

[FP 157 (Emphasis in original)].

Hermosillo said that on August 18, 2005, she arrived home in her white Jeep Grand Cherokee ("Jeep") with her two daughters, opened her garage door, and drove her Jeep in. [See Extradition Mem. 4-6 & Ex. 2 at 43; FP 156-160, 250-253, 264, 269-270, 324-328]. She noticed that the door leading into her home was open, which was unusual. [FP 250-251]. Hermosillo tried to make a cell phone call to her husband, who did not answer. She and her two daughters entered their home, where they were confronted by a man wearing a ski mask and carrying a pistol. [FP 251]. The man threatened them, bound Hermosillo's hands, and put Hermosillo and her daughters in the Jeep. [FP 251]. The man could not figure out how to open the garage door, and he told Hermosillo to "open the door and don't make this any harder." [FP 251]. Hermosillo told him about the remote on the visor and told him to press the button to open the garage door. [FP 251]. After the man opened the garage door, he drove out at high speed. [FP 251]. He took the "free road" and drove toward El Aguacate. While they were driving, the man nervously pulled on his ski mask, and Hermosillo noticed that he "[had] a large mark on his nose . . . [like] a mole or a scar . . . ." [FP 251].

As he drove, the man asked Hermosillo about her husband and the routes he took to work. [FP 251]. Hermosillo replied that her husband was a businessman who owned a shrimp farm and that she did not know what routes he took because she stayed home while he went to work. [FP 251]. At some point, the man stopped the car and taped Hermosillo's eyes, mouth, hands, and feet with duct tape. [FP 251]. He told her that he was taping up her daughters "so that they wouldn't scream." [FP 251].

The man later stopped the Jeep, took K.C.H. out of the car, and abandoned her. [FP 252]. About an hour later, he stopped the car again, took out C.J.C.H., and abandoned her. [FP 252]. He told Hermosillo that he did not intend to hurt them, and that he had left her daughters "in a place where the fishermen were going to find them . . . ." [FP 252]. He asked Hermosillo for the PIN number for her bank card, which she gave to him. He also asked whether her cell phone had her

husband's phone number on it, and she said that it did. The man eventually left Hermosillo by a tree near the side of the road, with her feet, hands, mouth, eyes, and ears taped. [FP 252]. Hermosillo used a piece of barbed wire to remove some of the tape, walked to the highway, and managed to get a ride into the town of Jolotemba. [FP 252]. Once there, she called her husband and asked him to pick her up. [FP 252].

On November 7, 2005, Hermosillo was "summoned by telephone" to the office of a Deputy District Attorney, "sworn under the terms of the law to tell the truth," and shown two black and white photographs of Rosas. Hermosillo "plainly identifie[d]" the man in the photographs "without any doubt" as her kidnapper. [FP 264, 269-270].

**Statement of Andrade**

On January 12, 2006, Andrade voluntarily appeared before a Deputy District Attorney in Tepic and gave a sworn statement.[7] [See Extradition Mem. 6 & Ex. 2 at 50-52, 57-58; FP 202-204, 321-323].

Andrade said that a day earlier, he had been at a store in the town of Ahuacate at about 9 p.m. when a man drove up in a vehicle, exited the vehicle, and approached him. The vehicle may have been a Nissan and was dark in color. Andrade could not identify the man because it was dark. The man asked him if he knew anything about the death of a little girl in August 2005. Andrade

---

[7]     The preface to Andrade's transcribed statement says that he was

sworn under the terms of the law to tell the truth in the proceedings in which he is to participate and advised of the penalties that may be imposed on any person that declares false statements before any authority other than a court authority in the performing of their function or by reason of same, as stipulated by the terms of Article 246, section I, of the Nayarit State Criminal Code, which states: "***Article 246.- A sentence of between two months and three years in prison and a fine of between one and ten days minimum salary shall be imposed Section I. - On any person who when questioned by any public authority other than a court authority, in the performing of their duties, or by reason of same declares false statements[.]***"

[FP 202 (emphasis in original)].

said he did not, because he does not like to "get involved in gossip or problems," but the man was "insisting so hard" that Andrade told him that approximately seven months earlier, he was drinking in a bar on Calle Zapata with two men he knew as El Chilango and El Pepe. Andrade had "gained their trust" because he had known them since February 2004 from working at the Rana Feliz Restaurant, Calle Hidalgo 147. [FP 202]. His boss had instructed him to go out and offer food to businesses, and he met the two men at a paint store owned by El Chilango's father-in-law. At the end of July 2005 or the beginning of August 2005, El Chilango, accompanied by El Pepe, asked Andrade if he was interested in pulling a "job." [FP 203]. El Chilango said they were going to ask "Beto"[8] for two million pesos.[9] When El Chilango told him that "the infamous Beto was from Xalisco, Nayarit," Andrade told him "definitely not," in front of El Pepe. Andrade had not seen El Chilango or El Pepe since. [FP 203].

From photographs, Andrade identified Rosas as "El Chilango" and Munoz as "El Pepe." Andrade said that when he realized in August 2005 that judicial police were looking for the two men, he wondered if they had ever pulled that "job." Having heard about the murder of Hermosillo's daughter, he did "not agree with keeping quiet about what they said to me" and "believe[d] they had something to do" with her death. [FP 203].

Andrade asked the authorities to fingerprint and photograph him to corroborate that he had nothing to do "with this crime." He denied that he had been physically or psychologically tortured and said he was appearing voluntarily. Having been asked by "this person I don't know" about this crime, Andrade did not "want to be implicated in the present events" and did not "want to receive

---

[8] It is undisputed that "Beto" is a common nickname for "Roberto," which is also the given name of Castellanos, Hermosillo's husband.

[9] According to historical foreign exchange "noon buying rates" posted on the website of the Federal Reserve Bank of New York, one United States dollar was worth about 10.5980 Mexican pesos on August 1, 2005. Therefore, two million pesos was the equivalent of about $188,714.85 United States dollars on that date. See *http://www.newyorkfed.org/markets/fxrates/historical/fx.cfm* (last visited May 2, 2011).

any summons that would frighten [his] family." With that, Andrade "confirmed [his] statement . . . under the terms of Articles 18 and 23 of the Nayarit State Criminal Procedures Code . . . ." [FP 204].

**Statement of Hurtado**

On March 14, 2006, Hurtado, assisted by a public defender, gave a statement "as a detained person" and "person of interest" to a Deputy District Attorney in Tepic, Nayarit. [FP 218]. Hurtado was sworn "under the terms of the law to tell the truth in the proceeding in which he will participate and [was] advised of this . . . ." [FP 218]. He also was

advised of the rights conferred to him under the terms of Article 20 of the Constitution of the United Mexican States; and Article 117 of the Nayarit State Criminal Procedures Code, to not declare if they so choose, or if they do declare, they may do so assisted by an attorney, to have proper defense, themselves or through [sic] an attorney or a person of trust, or if they do not wish to or are unable to designate counsel, then a state attorney will be assigned to them; that their counsel appear in all acts of the examination of evidence during the [p]reliminary investigation, permitting the accused and their counsel to consult the present investigation at this District Attorney's Office and in the presence of personnel assigned to same, and to receive and examine all evidences possible due to their nature . . . .

[FP 219].

Hurtado stated "that it is his will to declare," and he "request[ed] the assistance of his Public Defendant [sic] Mr. Juan Manuel Ramirez Duenas," who accepted the designation and presented his credential issued by the Government Secretary, with his license number. [FP 219; see FP 224 (bearing title of "Public Defender" with signature of Juan Manuel Ramirez Duenas)].

Hurtado said that in late July 2005, he ran into Jorge Gonzalo Lopez Chavez ("Lopez Chavez"), who took him to a paint store, where they met Rosas. [FP 219]. The three men bought beers together, then Lopez Chavez took Hurtado home. [FP 220].

On August 3, 2005, Hurtado again met with Lopez Chavez, who again took Hurtado to meet with Rosas at the paint store. [FP 220]. The three men bought beers together, then went to a nightclub on Calle Zapata and Zacatecas. [FP 220]. When the three men arrived at the nightclub, Munoz, "alias El Pepe Munos," was waiting for them. [FP 220]. Hurtado did not know Munoz at that time. While the four men were drinking in the nightclub, Hurtado overheard Rosas ask Munoz about "the job." [FP 220]. As Lopez Chavez, Hurtado, and Rosas were leaving the nightclub, Hurtado saw Rocio Lopez Mendivil ("Lopez Mendivil"), known to Hurtado as "Rosy," go into the nightclub. [FP 220]. Hurtado said that he thought she was going in to talk with Munoz. [FP 220]. When Lopez Chavez was driving Hurtado home, he asked what the "job" was, but Lopez Chavez did not answer. [FP 220].

The next day, August 4, 2005, Hurtado went to Lopez Chavez's house to ask again about the "job" that Rosas was referring to in the nightclub. Hurtado needed money and was curious. [FP 220]. Lopez Chavez offered to take Hurtado to see Rosas, who could tell Hurtado what the "job" was. [FP 220]. The two men met with Rosas at the same nightclub that night. [FP 221]. Rosas asked Hurtado if he was up for a kidnapping, and Hurtado said yes, thinking that Rosas was kidding. [FP 221].

On August 9, 2005, Hurtado met with Rosas again, who confirmed that the kidnapping plot was real, and assigned Hurtado a role in the plan. [FP 221]. Hurtado was assigned to watch the house where the kidnapping was going to occur and to alert the others when the intended victim, a woman, arrived at the house. [FP 221]. Rosas showed Hurtado pictures of the woman and her two daughters. [FP 221]. Hurtado subsequently learned that the woman was Hermosillo. Once Hurtado alerted the others that the victim had arrived home, Rosas was going to go into the home, grab the

14

victim, and put her in a black Nissan Altima. [FP 220]. Rosas, Lopez Mendivil, and Munoz would then drive the victim to a house Rosas had rented in Jolotemba. [FP 220].

On August 18, 2005, Rosas and Lopez Chavez picked up Hurtado and told him to watch the house where the kidnapping would occur. [FP 221]. Hurtado was instructed to call Rosas's cell phone when he saw the victim arrive home in a white SUV. [FP 221]. After making the call, Hurtado was instructed to wait to be paid by Rosas. [FP 221].

When Hurtado saw the white SUV arrive at the house, he called Rosas from a pay phone. [FP 222]. Then he went back to his position and watched as Lopez Chavez and Rosas drove up in front of the house. [FP 222]. He saw Rosas, "hooded," enter the house, and then drive off at high speed with the victim and her two daughters in the victim's car. [FP 222].

Hurtado further stated:

I want to add now that I read the statement rendered by Jose Luis Munoz Santos[, aka] PEPE MUNOZ, I state that these are all lies because he is presenting documents that aren't true and I say that because I identify him from the photographs of him in the file and because he did participate in that which I have stated and his witnesses are also lying, so is Jorge Gonzalo Lopez Chavez[, aka] EL PELON, as he also participated in the events and these two, together with Rocio Lopez Mendivil and Fausto Librado Rosas, were the ones that planned everything that has happened.

[FP 223]. Hurtado's statement concludes as follows:

[T]his is all I wish to declare in the presence of my public defender, with no coercion, physical or moral violence on the part of this office or on the part of the officers of the state police, and that which I have stated is the truth of the events and because it is not my intention to harm more people, therefore I have stated the truth of the events, therefore this being all that the accused has to declare, following

15

reading of his statement, he so confirms and signs before the Undersigned Deputy

District Attorney, assisted by the official recorder with whom he acts and attests.

[FP 224].

**Statement of Rosas**

On March 27, 2006, Rosas submitted a signed a statement to the judge presiding over his

criminal case, whose title was Fourth Criminal Judge of First Instance in the Fourth Court of

Criminal Matters of the Judicial District of Tepic. [FP 354].

Rosas said that he had known Munoz for "some years" because they had a business buying

and selling clothes. In approximately July 2005, Munoz told Rosas he was planning a "job," and

that it was necessary for them to meet in Tepic, Nayarit to discuss the details. Rosas could not

attend the meeting on the day Munoz proposed, so he asked Munoz for some details over the

phone. Munoz told Rosas only that "Pelon" has already gathered some people to carry out this

"job," and that it was a "secure deal, because the person from whom we were going to demand the

amount had the goods." [FP 354-355].

Rosas "got interested" and attended a meeting in Tepic in mid-July with "Pepe Munoz,"

"Pelon," and "Negro." Munoz and Lopez Chavez told Rosas and Hurtado that a sufficient amount

of money was going to be demanded from "Beto" "so that each of us got a good amount from the

ransom, but we were not told how much we were talking about." Halfway through the month of

July, Rosas "knew what the 'job' was." [FP 355].

Some days later, Rosas, Munoz, Hurtado, and Lopez Chavez gathered "in the discotheque

located at Zapata and Zacatecas Streets" to "get into detail so that nothing went wrong." The

meeting lasted "[s]ome hours." Among the details discussed was "the amount that should be

demanded of the Castellano Hermosillo" family. "Negro"—Hurtado—was asked if he wanted to

participate in the "job." Rosas thought Hurtado "thought we were joking because he laughed and

did not answer." [FP 355].

After leaving the discotheque, at about 11 p.m., Rosas and Munoz "ran into" Lopez Mendivil, Rosas's former sister-in-law. Lopez Chavez and Hurtado had already left. Munoz and Lopez Mendivil spoke together outside Rosas's presence. Munoz "gave her instructions to what she had to do, and it was to take care of the Mrs."—meaning the intended victim, Hermosillo—until the ransom was paid. [FP 355].

The following night, Rosas, Munoz, Lopez Chavez, Lopez Mendivil, and Hurtado gathered in the same discotheque at the corner of Zacatecas and Zapata streets to continue talking about the "job." By then, Hurtado had accepted the offer to participate. Munoz was investigating "Mrs. Dignora's" family, but Rosas said that he did not know what sources of information Munoz used because he did not say. However, Lopez Chavez worked for a paint store owned by Rosas's former father-in-law, and he frequently took paint buckets to a kindergarten attended by "one of the girls" on Paraiso Street, Colonia San Juan, "so he already knew her, and he had been checking the routes of the family because they went to pick up the girl." [FP 355]. Lopez Chavez also took several pictures of her, as well as of the vehicle driven by Hermosillo. [FP 355].

On or about August 9, 2005, Munoz, Lopez Chavez, Lopez Mendivil, Hurtado, and Rosas met again. Rosas told Hurtado that Munoz, aka "Pepe," had told him that Hurtado's role in the "job" was to check the family's house and let the others know when "a lady in a white van arrived" home. [FP 355-356].

On August 18, 2005, Hurtado carried out his assigned role by taking a cab to a spot where he could watch Hermosillo's home at 61 Perseveres Street, Colonia Las Brisas. [FP 356].

On August 18, 2005, at around 9:30 p.m., Hurtado informed the others that Hermosillo had arrived home with her two daughters in a white Jeep Cherokee. Rosas entered the home and hid behind a door. Meanwhile, Munoz and Lopez Mendivil were driving elsewhere in a car that "should have been used to transfer" Hermosillo "to the place where we would keep her until the ransom [was] collected." [FP 356].

Rosas, wearing a black ski mask, confronted Hermosillo and threatened her with a square-shaped, .38 caliber pistol. He told her not to be scared and that nothing would happen to her, and he put her in her car. Rosas was supposed to take only Hermosillo, but he got nervous, so he also put the girls in the car. Hermosillo opened the garage door, Rosas drove the car into the street, and she closed the garage door. He drove to the beltway and headed in the direction of Jalcocotan.

As they were driving, Rosas asked Hermosillo which routes her husband took to return to the city, and she said she did not know. Rosas received a cell phone call from Munoz, who told him to let the girls out and leave them together at a place close to the fishermen, in the area of Tapada de Platanitos. Rosas headed toward Platanitos, but then argued with Munoz on the cell phone because "I was going to leave the kidnapped persons in the wrong place . . . ." [FP 356]. Rosas drove fifteen minutes more, then let the girls out of the car separately and left them bound hand and foot, first the younger, then the older. [FP 357].

Munoz called and complained that Rosas had not done what they had agreed. Rosas explained that he got nervous, and he asked Munoz what to do. Munoz said that either "Pelon" or "Carpintero" would pick up the girls and take them to a safe place where Lopez Mendivil was waiting, because Rosas had left them in the wrong place. He also told Rosas to take Hermosillo's cell phone in order to call her husband and demand the ransom. Rosas left Hermosillo bound hand and foot by a tree. [FP 357].

Rosas drove back to Tepic in Hermosillo's car. He met with Munoz in the town of Aguacate and gave him Hermosillo's cell phone. While Rosas was there, at about noon on August 19, 2005, Munoz used the phone to call Hermosillo's husband. Munoz told Castellanos that his family had been kidnapped and demanded money in exchange for their freedom. When the phone call was completed, Rosas and Munoz left in Munoz's green Toyota van. [FP 357]. Munoz continued making phone calls, and Rosas does "not know why they did not pick up the girls from the place where I left them, because the plan was to take them to a rented house to take care of

them." [FP 357]. Munoz started "arguing hard" with another accomplice—Rosas did not know who it was—and afterwards told Rosas that they were in terrible trouble, but that he would solve it. However, Munoz disappeared and went to the city of Hermosillo, Sonora. [FP 357]. Rosas said that "we did not mean to hurt anybody, and least to deprive someone of life." [FP 357].

Rosas requested that the judge formally place Rosas's statement on the record, and that a new public defender be assigned to him. [FP 358].

**Application of the probable cause standard**

The government has presented competent evidence establishing probable cause to believe that Munoz participated in the kidnapping for which his extradition is sought. [Extradition Mem. 4].

Two witnesses, Rosas and Hurtado, gave detailed statements inculpating themselves and Munoz in the planning and execution of the kidnapping. The properly authenticated statements of Rosas and Hurtado are competent evidence and contain indicia of reliability.

Both Rosas and Hurtado incriminated themselves in the kidnapping along with Munoz. See Mainero, 164 F.3d at 1206-1207 (stating that "self-incriminating statements of accomplices are sufficient to establish probable cause in an extradition hearing," and holding that accomplice testimony that included hearsay and inculpated the accused was "self-incriminating, and thus . . . not unreliable as a matter of law"); see Zanazanian, 729 F.2d at 627-628 ("This circuit has held that the self-incriminating statements of accomplices are sufficient to establish probable cause in an extradition hearing.") (citing Curreri v. Vice, 77 F.2d 130, 132 (9th Cir. 1935) (holding that the testimony of an accomplice was competent and was sufficient to show probable cause)); see also Eain v. Wilkes, 641 F.2d 504, 510 (7th Cir.) (stating that accomplice testimony "may be of particular importance in extradition cases where all the alleged criminal activity occurred in a distant country," and holding that an accomplice's statements inculpating both himself and the

accused "were admissions against his own penal interest and are deemed reliable") (cited with approval in <u>Zanazanian</u>, 729 F.2d at 628-629), <u>cert. denied</u>, 454 U.S. 894 (1981).

Rosas and Hurtado also reported several consistent facts regarding the planning and execution of the kidnapping, including facts implicating Munoz. For example, Rosas and Hurtado both described meetings with Munoz on consecutive nights at a nightclub or discotheque located at or near Zapata and Zacatecas streets in the city of Tepic. Hurtado said that those meetings occurred on the evenings of August 3, 2005, and August 4, 2005. [FP 355-356]. Rosas did not supply precise dates, but he indicated that the meetings occurred some time after a mid-July meeting between himself, Munoz, Lopez Chavez, and Hurtado and before a subsequent meeting on August 9, 2005.[10]

Rosas and Hurtado said that during both of the meetings at the nightclub, Munoz discussed and planned a "job" with them and Lopez Chavez, and that the "job" referred to a kidnapping. [FP 220-221, 354-355]. During the course of the meetings at the nightclub, Hurtado was asked to participate in the kidnapping, and he agreed to do so. [FP 221, 355]. Rosas and Hurtado learned that the plan was to kidnap Hermosillo from her home in "Las Brisas," although whether they knew her name at that point is unclear. They both said that the kidnappers were aware that Hermosillo had two daughters, but that the plan called for kidnapping only Hermosillo. [FP 220-221, 355].

Rosas and Hurtado said that they met again on August 9, 2005, when Rosas told Hurtado that his role in the kidnapping would be to watch Hermosillo's house and call to let the others know when she arrived home. Rosas and Hurtado said that the plan called for Rosas to get the victim from her house into a vehicle (either a Ford LTD or a Nissan Altima) furnished by the kidnappers. Munoz and Lopez Mendivil would be waiting at a spot away from the victim's house

---

[10] Hurtado said nothing about a mid-July meeting and reported that he did not know Munoz before meeting him on August 3, 2005.

in an Altima that the kidnappers would ultimately use to transport Hermosillo to the location where she was to be held until the ransom was collected. [FP 220-221, 355-356].

Rosas and Hurtado both said that things did not go according to plan on the day of the kidnapping. On August 18, 2005, Hurtado took a cab to his assigned position down the street from Hermosillo's house. Some time after 9 p.m, Hurtado saw Hermosillo arrive home in a white SUV. He phoned Rosas, who arrived at the house in a Ford LTD. Hurtado said that Lopez Chavez was in the car and drove it away after Rosas got out, but Rosas did not say what became of the car. Rosas and Hurtado said that Rosas entered Hermosillo's house wearing a ski mask, or something similar, on his head. Contrary to plan, Rosas drove off in Hermosillo's white SUV with her and her daughters. [FP 222, 356].

Hurtado went to the location where Munoz and Lopez Mendivil were waiting. Munoz argued with Rosas on his cell phone about not following the plan for the kidnapping. [FP 222, 356].

There are some factual discrepancies in the statements of Rosas and Hurtado. However, those discrepancies do not undermine the overall consistency between their accounts and are not so numerous or material that they render the inculpatory statements unreliable, or explain away the government's probable cause showing.

In addition, Andrade's statement contains facts that are consistent with facts contained in the statements of Rosas, Hurtado, or both. Andrade said that he became acquainted with Rosas and Munoz at a paint store owned by Rosas's father-in-law. Rosas mentioned that Lopez Chavez worked at a paint store owned by Rosas's former father-in-law. Hurtado said that Lopez Chavez took him to meet Rosas at a paint store. Andrade also said that he went drinking with Rosas and Munoz at a bar on a street named Zapata at the end of July 2005 or the beginning of August 2005, and that Rosas, in the presence of Munoz, asked him if he was interested in pulling a "job," in reference to a kidnapping for ransom. That statement is similar to Rosas's and Hurtado's accounts

21

of being asked by Munoz to participate in a "job," the kidnapping of Hermosillo. Andrade also said that Munoz told him that the job involved asking "Beto" for the sum of two million pesos, which is consistent with what Rosas reported Munoz said to him.

Other indicia of reliability also are present. The record indicates that Andrade voluntarily appeared at the prosecutor's office to provide his statement, and he did so under penalty of perjury. Similarly, Hurtado was "sworn under the terms of the law" to tell the truth, and he was assisted by counsel when he made his statement to a prosecutor. [FP 218]. See Mainero, 164 F.3d at 1202, 1207 (holding that the extradition judge did not abuse his discretion in finding that probable cause existed based on detailed inculpatory statements, including hearsay, made by three accomplices of the accused to an agent of the Mexican federal public prosecutor while the three were represented by counsel).

Rosas made his statement before a criminal court judge in Mexico. That statement was unsworn; however, that does not make it inadmissible or preclude its use to establish probable cause for extradition purposes. See Mainero, 164 F.3d at 1202, 1207 (holding that probable cause existed where, among other things, the accuseds' accomplices had made incriminating statements to a criminal court judge); Zanazanian, 729 F.2d at 628 (holding that where the treaty contained no oath requirement, the fact that unsworn statements "were given to the police and incriminated the speakers themselves sufficiently indicates their reliability"). Similarly, the statements of Rosas, Hurtado, and Andrade are not incompetent merely because they include hearsay. See Then, 92 F.3d at 855 ("[H]earsay evidence is admissible to support a probable cause determination in an extradition hearing . . . .").

Munoz argues that Andrade is "missing," that his motives are suspect, and therefore his statement is unreliable. [Opposition 54-56]. Munoz submitted an investigator's declaration describing unsuccessful attempts to locate Andrade. Among other things, the investigator said that she went to Tepic and interviewed relatives and acquaintances of Andrade. Some of the

interviewees intimated that Andrade may have died, while others said that they had heard that he had gone to Los Angeles, but none of them provided definitive information about Andrade's current whereabouts. Munoz also submitted documents indicating that a court in Mexico had issued legal process seeking, unsuccessfully, to compel Andrade's attendance and testimony during Lopez Mendivil's criminal trial in Mexico. [See Opp., Ex. 174]. Andrade's apparent unavailability does not preclude reliance on his statement to establish probable cause. See Collins, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the state on a preliminary examination.").

Munoz also argues that Andrade's account is "incredible" and that his motives are suspect because he did not produce an acceptable form of identification to the prosecutor who took his statement, and because Andrade was unwilling or unable to identify the man who ostensibly asked him if he knew anything about Hermosillo's daughter's death. [Opp. 54-56].

Andrade's failure to provide a legally acceptable form of identification does not render his statement inadmissible. See Mainero, 164 F.3d at 1206 (holding that the extradition judge permissibly considered the testimony of "a confidential witness, which independently corroborates the involvement of" the accused). As to Andrade's motive, he said that he provided his statement to authorities because he wanted to exonerate himself of involvement in the crime after being approached by the unidentified man who "insist[ed]" on knowing whether Andrade had any information about the crime. That explanation is not implausible. If Andrade had merely speculated that Munoz and Rosas were involved in the death of Hermosillo's daughter, his statement would have little probative value, especially since he said that he was aware that police were looking for the two men after the kidnapping. However, Andrade related facts that independently corroborated certain facts provided by Rosas and Hurtado, such as the use of Rosas's father-in-law's paint store as a meeting place, his solicitation by Rosas and Munoz for a

23

"job" at a bar on Calle Zapata in late July 2005 or early August 2005, and hearing Munoz say that a ransom would be demanded from "Beto." In addition, Andrade identified Munoz and Rosas from photographs. See generally Illinois v. Gates, 462 U.S. 213, 233-234 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary. Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case.") (citing Adams v. Williams, 407 U.S. 143, 146-147 (1972)).

Munoz also argues that Hermosillo's statement does not help establish probable cause because it does not directly link him to the kidnapping, and that Hermosillo's photographic identification of Rosas is unreliable because Rosas lacks some of the physical characteristics she described in her initial statement to authorities on August 29, 2005. In that statement, Hermosillo described her abductor as a man about 1.9 meters (6'2") tall, with "a large mark on his nose, I don't know if it was a mole or a scar . . . ." [Opp., Ex. 119 at 88, 90]. Hermosillo also said that her abductor's "accent was like from the coast, like how people from Acaponeta or Tecuala speak," referring to cities on the west coast of Mexico. [Opp., Ex. 119 at 90].

On November 7, 2005, after being summoned to the District Attorney's Office in Tepic to view photographs, Hermosillo signed a statement under penalty of perjury identifying Rosas as her kidnapper from a police record dated July 20, 2004 containing two photographs of him, one from the front and one in profile. [FP 196]. Munoz argues that Rosas does not match Hermosillo's description of her abductor in her August 29, 2005 statement, and that Hermosillo could not have gotten a clear look at her abductor's face because he wore a ski mask.

Munoz notes that Rosas is a native of Mexico City, a city located hundreds of miles inland from the west coast cities of Acaponeta or Tecuala. [Opp. 57 & Ex. 130 at 285]. Furthermore, a

March 21, 2006 medical examination report noted no scars or marks on Rosas's nose. [Opp. 57 & Ex. 132 at 23]. In addition, a September 20, 2006 court document states that Rosas was 1.78 meters (5'8") tall, some six inches shorter than Hermosillo estimated her abductor to be. The same document described Rosas as being "without obvious marks on the face [without tattoos, beauty marks, scars, etc.]." [Opp. 57 & Ex. 145].

"'[T]here is no per se rule that specifies which identification procedures are competent for probable cause purposes.' An identification based on a single photograph may be competent evidence of identity in an extradition proceeding." Manta, 518 F.3d at 1144-1145 (internal quotation marks omitted). Although Munoz raises legitimate concerns regarding Hermosillo's identification of Rosas, they do not warrant disregarding that identification as part of the government's probable showing. The "large mark" on the kidnapper's nose could have been temporary or remediable, so that it was no longer evident several months after the kidnapping, when Rosas's physical characteristics were described in court records. Hermosillo could have misjudged or misstated her abductor's height by several inches. Although Rosas was a native of Mexico City, he did not live there at the time of the kidnapping. He said in his statement that he "usually lived" in Hermosillo, Sonora, Mexico. [FP 354]. Where else Rosas might have lived prior to August 2005, or what kind of accent he may have had, is not clear from the record, so Hermosillo's statement that her abductor had what sounded like a regional accent does not render her photo identification defective. Cf. Manta, 518 F.3d at 1144-1145 (rejecting the contention that a photo identification was impermissibly suggestive and unreliable because it occurred eight years after the witness last saw the accused, involved only a single photograph, and the photograph was displayed as part of a passport with the accused's name and other identifying information visible). Hermosillo's photo identification of Rosas is competent evidence that tends to enhance the reliability of the statements made by Rosas and Hurtado inculpating themselves and Munoz in the kidnapping.

During the extradition hearing, the government argued that evidence of flight by Munoz created an inference of consciousness of guilt that supports probable cause. [See Extradition Hearing Transcript 58-59]. The government noted that Rosas said that Munoz "disappeared" after the kidnapping and went to Hermosillo, Sonora. The government also cited allegations in the Complaint that Munoz was a passenger in a vehicle that led federal agents, "whose vehicles displayed activated red lights, on a 30-minute pursuit, during which the driver made several evasive and counter-surveillance maneuvers." [Complaint 10; Extradition Hearing Transcript 58-59]. Federal agents summoned a marked Los Angeles Police Department ("LAPD") unit. LAPD officers subsequently conducted a traffic stop and apprehended the driver and Munoz. [Complaint 10]. Munoz argued that a negative inference was unwarranted because the police car was unmarked and Munoz was not in control of the vehicle. [Extradition Hearing Transcript 63-65].

Evidence of flight that is suggestive of consciousness of guilt is admissible to establish probable cause in an extradition proceeding. See Curreri, 77 F.2d at 133 (holding that the accused's flight after the charged offense "was competent to corroborate the testimony of [an] accomplice as to the participation of the [accused]"); see also Eain, 641 F.2d at 511 ("Flight also is a legitimate ground from which to infer guilt and here, at the least, lends itself to use as corroboration of [an accomplice's inculpatory statement] in the consideration of probable cause."). Although the evidence of flight is not without ambiguity, it has some tendency to support probable cause.

For all of the foregoing reasons, the government has presented competent evidence establishing probable cause to believe that Munoz was involved in the kidnapping offense for which his extradition is sought. Collins, 259 U.S. at 314.

**Admissibility of Munoz's evidence**

Munoz seeks to offer evidence to rebut the government's probable cause showing. He contends that he has evidence showing that: (1) he has an alibi defense; (2) the inculpatory statements made by Rosas and Hurtado relied on by the government to establish probable cause were obtained by torture; and (3) Rosas and Hurtado subsequently recanted those inculpatory statements; and (4) the recantations are more reliable than the inculpatory statements.

In general, "[a]dmission of evidence in an international extradition proceeding is within the magistrate's discretion." In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir.), cert. denied, 479 U.S. 990 (1986). "Participation by the fugitive at the extradition proceeding is limited; he is not permitted to introduce evidence on the issue of guilt or innocence but can only offer evidence that tends to explain the government's case of probable cause." Hooker v. Klein 573 F.2d 1360, 1368 (9th Cir.), cert. denied, 439 U.S. 932 (1978); see Quinn, 783 F.2d at 817 n.41 (stating that the accused "may offer limited evidence to explain elements in the case against him"). Thus, the accused may testify "to things which might have explained ambiguities or doubtful elements" in the government's case against him. Collins, 259 U.S. at 315-316; see Gill v. Imundi, 747 F.Supp. 1028, 1044, 1045 (S.D.N.Y. 1990) (stating that the purpose of the rule against admitting "contradictory" evidence is "preventing a full-scale trial, involving witnesses telling competing stories"); Jacques Semmelman, The Rule of Non-Contradiction in International Extradition Proceedings: a Proposed Approach to the Admission of Exculpatory Evidence, 23 Fordham Int'l L. J. 1295, 1297 (2000) (explaining that under traditional extradition jurisprudence, a "rule of non-contradiction" applies permitting the accused to introduce only evidence that "explains" the government's evidence, "i.e., that provides an innocent explanation for events that the government contends point toward guilt. In particular, to the extent that the government relies upon circumstantial evidence, the accused is generally permitted to introduce evidence that helps to explain it away.").

However, evidence that *contradicts* or *controverts* the existence of probable cause is inadmissible, including evidence establishing a defense or exonerating the accused. Collins, 259 U.S. at 316 (holding that "evidence related strictly to the defense" was properly excluded); Charlton, 229 U.S. at 461 (holding that the extradition court properly excluded evidence relevant to show insanity, explaining that "[t]o have witnesses produced to contradict the testimony for the prosecution is obviously a very different thing from hearing witnesses for the purpose of explaining matters referred to by the witnesses for the government," and analogizing to the principle that "[a] defendant has no general right to have evidence exonerating him go before a grand jury"); Barapind, 400 F.3d at 749 ("Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible.") (quoting Mainero, 164 F.3d at 1207 n.7); In re Solis, 402 F.Supp.2d 1128, 1131 (C.D. Cal. 2005) ("[A] fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country."); In re Extradition of Mainero, 990 F.Supp. 1208, 1218 (S.D. Cal. 1997) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses."); see, e.g., In re Extradition of Berri, 2008 WL 4239170, at *3 (E.D.N.Y. Sep. 11, 2008) (holding that a third country's judgment offered by the accused "d[id] nothing to explain the [requesting nation's] evidence" because it "d[id] not seek to cast a different light on the proof submitted in support of the extradition request by offering a compelling alternative view of the evidence. Rather, [the accused] seeks to use the judgment as contradictory proof that he is innocent."); see also Semmelman, The Rule of Non-Contradiction, 23 Fordham Int'l L. J. at 1296 & nn. 10-11 ("International extradition proceedings in the U.S. courts are governed by the evidentiary rule that the accused has no right to present a defense to

the charges against him, such as an alibi defense," innocence, duress, insanity, or justification) (footnotes omitted).

The United States Supreme Court has explained that the accused does not have the "right to introduce evidence in defense" in an extradition proceeding because to hold otherwise

> "might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties."

Collins, 259 U.S. at 316 (quoting In re Wadge, 15 F. 864, 866 (D.C.N.Y. 1883) (denying habeas relief on the ground that the extradition judge permissibly declined to allow the accused to present alibi testimony and properly "remitt[ed] the accused to his trial there, where these witnesses could be produced in person and their credibility examined"), aff'd, 16 F. 332 (C.C.N.Y. 1883)); see also Bingham, 241 U.S. at 517 (stating that "one of the objects of" the predecessor to 18 U.S.C. § 3190 "was to obviate the necessity of confronting the accused with the witnesses against him; and a construction of this section, or of the treaty, that would require the demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty").

**Alibi evidence**

Munoz argues that he has alibi witnesses and other evidence demonstrating that he was not in or near Tepic on certain dates he is alleged to have been there planning or participating in the kidnapping, and that Rosas, Hurtado, and Lopez Mendivil also have alibi defenses. Munoz argues that his alibi evidence "negates" the government's probable cause showing and therefore is admissible to defeat probable cause. [See Opp. 20-21, 24-25, 37-38, 58]. The government argues that alibi evidence is inadmissible in an extradition hearing, and further that Munoz's alibi evidence is inconclusive. [Gov. Reply 49-53].

Munoz contends that he was in Los Angeles, California during the end of July 2005 and the beginning of August 2005, the period of time during which the government alleges that he was planning the kidnapping in Tepic. Munoz also contends that he was on a family vacation in Guadalajara, Mexico from August 18, 2005, the date of the kidnapping, through August 21, 2005. [See Opp. 11-14]. Munoz has submitted evidence in support of his alibi defense, including a statement he gave to Mexican authorities asserting an alibi defense, declarations from relatives and others regarding Munoz's whereabouts at relevant times, photographs, copies of airline tickets, and credit card receipts which Munoz contends were signed by him. [See Opp., Exs. 103, 113, 122, 131 at 54, 136-139, 141, 184, 185, 188-190].

The United States Supreme Court and the Ninth Circuit have held that evidence offered to prove the existence of a defense to the charged offense, such as an alibi, is contradictory evidence that is not admissible in an extradition hearing. See Collins, 259 U.S. at 316 (rejecting the accused's contention that he "was not permitted to introduce evidence in his own behalf" where "[t]he evidence excluded related strictly to the defense"); Charlton, 229 U.S. at 462 (holding that the extradition judge "did not exceed his authority in excluding evidence of insanity" because if the evidence "was offered to show insanity at the time of the commission of the crime, it was obviously a defense which should be heard at the time of his trial, or by a preliminary

hearing in the jurisdiction of the crime, if so provided for by its laws"); Quinn, 783 F.2d at 817 n.41 ("[T]he accused is not entitled to introduce evidence that goes to his defense . . . ."); Hooker, 573 F.2d at 1368 ("[T]he extraditing court properly may exclude evidence of alibi, . . . or of a defense such as insanity."); Desmond v. Eggers, 18 F.2d 503, 505-506 (9th Cir. 1927) (stating that "[a]ll of the authorities agree" that "matters which are only a defense to a trial on the merits are not admissible"; holding that alibi testimony was properly excluded because it "would necessarily tend to contradict" the affidavits of government witnesses who testified that the accused "committed the crime charged in their presence in British Columbia" on the same date; and stating that "a foreign government should not be required to produce testimony before [an extradition] magistrate in this country" to rebut alibi testimony); see generally Semmelman, The Rule of Non-Contradiction, 23 Fordham Int'l L. J. at 1296, 1325 (explaining that "[i]nternational extradition proceedings in the U.S. courts are governed by the evidentiary rule that the accused has no right to present a defense to the charges against him, such as an alibi defense," and that alibi evidence "does not 'explain' the government's case; it contradicts it") (footnotes omitted).

Some courts have interpreted the "rule of non-contradiction" to allow the introduction of contrary evidence so long as that evidence can be said to completely "negate" or "obliterate" probable cause, including two cases on which Munoz relies in arguing for the admission of his proffered evidence. See In re Gonzalez, 52 F. Supp. 2d 725, 738-740 (W.D. La. 1999) (admitting "credible" alibi evidence that "undermines, or 'negates' the existence of probable cause"); In re Contreras, 800 F. Supp. 1462, 1465, 1469-1470 (S.D. Tex. 1992) (holding that where all of the statements inculpating the accused had been recanted and there was no other evidence supporting probable cause, the recantations "negated" probable cause and were admissible); see also Republic of France v. Moghadam, 617 F. Supp. 777, 783 (N.D. Cal. 1985) (admitting recantation evidence that "negates the only evidence of probable cause").

Those cases are not controlling. Furthermore, their formulation of the rule of non-contradiction appears to be an unwarranted gloss on language construing the scope of *explanatory* evidence found in two Southern District of New York cases. See In re Sindona, 450 F. Supp. 672, 685, 687, 690 (S.D.N.Y. 1978) (stating that "[i]n admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause," and holding that the accused's offer of proof to show the lawfulness of certain transactions was "not truly 'explanatory' within the meaning of the authorities" and did "not negate" probable cause); Shapiro v. Ferrandina, 355 F. Supp. 563, 572 (S.D.N.Y. 1973) ("What tends to obliterate probable cause may be considered but not what merely contradicts it. The improbability or the vagueness of testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not."), aff'd as modified, 478 F.2d 894 (2d Cir. 1973) (holding that the district judge permissibly excluded evidence bearing on the credibility of an inculpatory statement and on whether the accused actually uttered certain statements that were allegedly fraudulent because that evidence "would in no way 'explain'—or, as the district judge put it, 'obliterate'—the government's evidence, but would only pose a conflict of credibility. Such a contest, the judge permissibly ruled, should properly await trial in Israel."), cert. dismissed, 414 U.S. 884 (1973).[11]

---

[11] See also Semmelman, The Rule of Non-Contradiction, 23 Fordham Int'l L. J. at 1314-1328 (concluding that "Shapiro and Sindona introduced, respectively, the words 'obliterate' and 'negate' into the formulation of the Rule of Non-Contradiction," leading other courts that adopted the terminology to conclude, erroneously, "that contradictory evidence may be admitted if it negates or obliterates probable cause," and stating that "[b]ecause negation or obliteration via contradictory evidence—such as evidence of recantation or alibi—requires a trial on the merits to determine credibility, admission of such evidence is fundamentally incompatible with U.S. extradition treaties").

Munoz's alibi evidence "would necessarily tend to contradict the testimony of [the government's] witnesses," Desmond, 18 F.2d at 506, and its admission would require this court to weigh conflicting evidence and assess its relative credibility. Those determinations should be made by a Mexican court with access to the full range of evidence developed by the prosecution and the defense. See Charlton, 229 U.S. at 462 (holding that the evidence relevant to establish an insanity defense was properly excluded and "should be heard at the time of [the accused's] trial"); Lopez-Smith, 121 F.3d at 1326 (noting that Charlton's holding has not been overruled or qualified and remains binding); Desmond, 18 F.2d at 505-506 (rejecting a claim that the accused should have been allowed to introduce alibi evidence).

**Recantation evidence**

Munoz seeks to introduce statements by Rosas and Hurtado recanting the inculpatory statements relied on by the government and claiming that those inculpatory statements were obtained by torture or coercion. [See Opp.21-25, 26-29, 45-51, 59]. The government, on the other hand, contends that Munoz's recantation evidence and evidence offered to show that the inculpatory statements were obtained by torture or coercion is prohibited contradictory evidence, and that even if that evidence were admissible, it does not prove that the inculpatory statements are unreliable. [See Gov. Reply 6-40].

On May 25, 2006, Rosas, represented by a public defender, appeared before a criminal court judge, was "placed under oath to tell the truth," and recanted his prior March 27, 2006 statement. Specifically, Rosas said he "den[ied] the parts [of his March 27, 2006 statement] which implicate me" on the grounds that: (1) the contents of the statement were not read to him before he was forced to sign it; (2) after he signed the statement he was asked only to confirm that the signature was his, not the truth of the statement; and (3) he was forced to sign the statement under threats of harm to himself and his family, "pressure," and "beatings" that he received "on several

occasions." [Opp. 24 & Ex. 111 at 738-742]. Rosas described the abuse he allegedly received while in custody and also attempted to establish an alibi or partial alibi. Rosas said that he found out about the "incident" from "Pepe Munoz," who called Rosas to tell him that Munoz had implicated both of them in a statement made to the judicial police after being tortured. Rosas said that Munoz also reported that he subsequently had given a statement to the District Attorney's Office denying their involvement. In his recantation, Rosas did not explicitly deny the parts of his inculpatory statement that implicated Munoz or anyone else other than himself. [Opp., Ex. 111 at 738, 740].

On March 2, 2006, Hurtado, represented by private defense counsel, appeared before a criminal court judge, was "advised to state the truth in everything he is about to declare," and said that he did not ratify either a prior exculpatory statement made by him (a "ministerial declaration" dated October 12, 2005) or his inculpatory statement dated March 14, 2006. [Opp. 19-20 & Ex. 172]. Hurtado said that he signed both of those statements under torture and threats of harm to himself and to his family, which he described in further detail. Hurtado said that he "didn't have anything to do with this" and did not "know the girl nor the other two people," and that "the declaration that I ga[v]e is false and it was because of the torture . . . ." [Opp., Ex. 172 at 698].

Munoz also has offered voluminous additional evidence, which, he argues, tends to enhance the reliability of the recantations, alibi evidence, or allegations of torture and threats by Mexican police and others. The additional evidence includes, but is not limited to: (1) additional declarations by Munoz, Hurtado, and other witnesses who had some connection to Munoz or his co-defendants in the criminal case in Mexico; (2) newspaper articles identifying Hermosillo's husband's brother as a suspected drug dealer who reportedly attacked Mexican soldiers; (3) copies of reports of forensic medical examinations of Munoz; (4) bank records, hotel records, Western Union records, and similar evidence offered to establish alibi defenses by Munoz or his co-

34

defendants; (5) Mexican court documents showing that an appeals court reversed the kidnapping conviction of Lopez Mendivil, acquitted her, and ordered her immediate release from custody; and (6) reports on human rights practices in Mexico prepared by the U.S. Department of State, Bureau of Democracy, Rights, and Labor.

The Ninth Circuit has "never determined" whether "recantation evidence is admissible in an extradition hearing." Mainero, 164 F.3d at 1207 n.7 (noting that courts have split on the issue, citing Eain, 641 F.2d at 511-512 and Contreras, 800 F.Supp. at 1464, 1469). The Ninth Circuit declined to reach the issue in Mainero because the extradition magistrate "did not refuse to consider [the accused's] proffered recantation evidence," and having considered that evidence, concluded that it did not explain away the government's probable cause showing. Mainero, 164 F.3d at 1207 n.7.

In Barapind, which was decided by the Ninth Circuit after Mainero, the en banc court considered whether the extradition court erred in holding that probable cause was not destroyed by a witness's recantation of his prior identification of the accused as the driver of a scooter carrying a gunman who killed one man and wounded another. The extradition court concluded that "'the credibility of [the] recantation cannot be determined without a trial,' which would exceed the limited mandate of an extradition court in making a determination of probable cause, as opposed to ultimate guilt." Barapind, 400 F.3d at 749 (quoting In re Extradition of Singh, 170 F.Supp.2d 982, 1024 (E.D. Cal. 2001), aff'd in part and rev'd in part by Barapind, 400 F.3d at 753). Affirming that holding, the Ninth Circuit explained that the recantation evidence admitted by the extradition court "did not obliterate [the requesting nation's] showing of probable cause" because that evidence "constituted conflicting evidence, the credibility of which could not be assessed without a trial," and "extradition courts 'do not weigh conflicting evidence' in making

their probable cause determinations . . . ." Barapind, 400 F.3d at 749 (citing Singh, 170 F.Supp.2d at 994).

There is no meaningful distinction between the type of recantation evidence at issue in Barapind and the recantation evidence offered here. Barapind did not resolve whether the recantation evidence could properly have been excluded in that case because, as in Mainero, the extradition court admitted all of the accused's evidence after explaining that it found "the distinction between contradictory, explanatory, and obliterating evidence . . . difficult to understand, much less apply . . . ." Singh, 170 F.Supp.2d at 998-999 (internal quotation marks omitted). Nonetheless, Barapind stands for the proposition that recantation evidence is contradictory evidence, and that the complex, nuanced, fact-intensive inquiry into the comparative reliability of inculpatory statements and recantations, including the circumstances under which the statements were obtained, is appropriately reserved for determination by courts of the requesting state, which have access to the full panoply of evidence. See Barapind, 400 F.3d at 749.

That conclusion is supported by well-reasoned decisions from the Seventh Circuit, and some district courts within this circuit, holding that recantation evidence and other evidence requiring courts to weigh credibility and resolve material factual disputes is inadmissible in an extradition case. See Bovio v. United States, 989 F.2d 255, 259 (7th Cir. 1993) (holding that an accused had "no right to attack the credibility of [the government's witnesses] at this stage of the proceedings; issues of credibility are to be determined at trial"); Eain, 641 F.2d at 511 (holding that the court did not err in refusing to admit recantations of inculpatory statements by the accused's alleged accomplices because those statements "tend to contradict or challenge the credibility of the facts implicating" the accused, who "has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence

which explains or clarifies that proof") (citing <u>Shapiro</u>, 478 F.2d at 905); <u>In re Extradition of</u>

<u>Powell</u>, 4 F.Supp.2d 945, 957 (S.D. Cal. 1998) (denying an accused's request to present evidence

relevant to show the unreliability of the government's evidence and a duress defense, because

"[r]ebuttal, presentation of contradictory evidence, and examination or cross examination of

witnesses are not appropriate in this setting," and allowing presentation of such evidence would

amount to a "minitrial"); <u>In re Solis</u>, 402 F.Supp.2d at 1131-1132 (concluding that an "attack on

the means by which the Mexican evidence was obtained" was a "prohibited contradiction in the

evidence" because such an attack "challenges the veracity and validity of [the government

witness's] statements," and excluding evidence that a witness who made an inculpatory statement

later said that he did not know what he signed, was forced to sign the statement, and was

threatened with death if he came to the United States to testify on the accused's behalf) (citing

<u>United States v. Peterka</u>, 307 F.Supp.2d 1344, 1349 (M.D. Fla. 2003) (stating that at an extradition

hearing, "the court shall exclude evidence that is proffered to . . . challenge the credibility of

witnesses"); <u>Powell</u>, 4 F.Supp.2d at 958 (holding that the accused was "foreclosed from presenting

evidence as to the unreliability of" the government's witnesses); <u>Extradition of Singh</u>, 124 F.R.D.

571, 579 (D.N.J. 1987) ("[T]here is no issue better designed to convert this [extradition]

proceeding into a dress rehearsal trial than a dispute between defendants and the Government as

to whether [the witness] was coerced into making a confession.") (footnote omitted)).[12]

---

[12]    During the extradition hearing, Munoz's counsel cited <u>In re Strunk</u>, 293 F.Supp.2d 1117 (E.
D. Cal. 2003) in support of his contention that his recantation evidence should be admitted.  In
<u>Strunk</u>, the court held that the confession of an alleged accomplice of the accused implicating both
men in the charged murder was insufficient to establish probable cause. Included in the extradition
"package" was the alleged accomplice's recantation of that statement and evidence about the
circumstances surrounding his confession and recantation. The extradition court acknowledged that
the accused should only be permitted explanatory evidence, and only if it was "reasonably clear cut,
but called the distinction between contradictory and explanatory evidence "metaphysical." <u>Strunk</u>,
293 F.Supp.2d at 1122.  The court admitted the recantation evidence, reasoning that it was
"presented by" the Philippine government, had relatively greater indicia of reliability than the
confession, and demonstrated "inconsistencies" in the government's evidence that destroyed
probable cause. The court also admitted alibi evidence offered by the accused regarding his

Munoz's proposed witnesses' testimony is offered to contradict the version of the facts set forth in the inculpatory statements and to provide a competing, conflicting version of the facts. Therefore, Munoz's evidence offered to show that the inculpatory statements relied on by the government to establish probable cause were recanted and were procured through torture or coercion is inadmissible and has not been considered in determining probable cause.

**Convention Against Torture**

Munoz argues that his extradition should be denied because "[g]iven the record of torture and death threats" in this case, "it is extremely likely that [Munoz] and his family will be subjected to grievous harm" in the form of torture, threats, and even assassination if he were returned to Mexico. [Opp. 59-61]. Munoz argues that this possibility warrants denying the government's request for extradition under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (the "Convention Against Torture"). The United States ratified the Convention Against Torture and became a full state party in November 1994. See Cornejo-Barreto, 218 F.3d at 1011.[13]

_____

whereabouts on the night of the murder. Strunk, 293 F.Supp.2d at 1126-1134.

Strunk is not persuasive. This court is aware of no authority for the proposition that a recantation is admissible to demonstrate inconsistencies in the government's probable cause showing merely because it was included as part of the record in an extradition request where the government opposes its admission and does not rely on it. Furthermore, to the extent that Strunk conditions admissibility of recantation evidence on an extradition court's assessment of the credibility and weight of recantation evidence compared to the government's evidence, it runs contrary to Ninth Circuit authority holding that extradition courts do not weigh conflicting evidence. See Barapind, 400 F.3d at 749; Quinn, 783 F.2d at 815.

Strunk also is distinguishable. The credibility of the accomplice's confession in that case was tainted by the undisputed fact that he requested and received compensation for his family "in consideration for [his] confession by Philippine government authorities," leading the court to conclude that the government's chief witness was "generally unworthy of belief" concerning the accused's involvement in the crime. Strunk, 293 F.Supp.2d at 1123, 1126. That circumstance is not present in this case.

[13]    The Convention Against Torture prohibits the extradition of a person to "another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

Plaintiff may not obtain judicial review in this case of his claim that his extradition to Mexico would violate the Convention Against Torture. See <u>Cornejo-Barreto</u>, 218 F.3d at 1007-1009, 1016-1017) (affirming denial of a habeas petition challenging a certification of extraditability and commitment order under the Convention Against Torture on the ground that those claims are not ripe for judicial review until the Secretary of State determines that the accused will be surrendered to the requesting nation).

**Humanitarian exception**

Munoz also argues that the likelihood he and his family will be harmed if he is returned to Mexico warrants application of a "humanitarian exception" to the "rule of non-inquiry." [Opp. 62-63].

The Ninth Circuit has "long adhered to the rule of non-inquiry—that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." <u>Prasoprat</u>, 421 F. 3d at 1016 (citing <u>Blaxland</u>, 323 F.3d at 1208; <u>Barapind v. Reno</u>, 225 F.3d 1100, 1105-1106 (9th Cir. 2000); <u>Lopez-Smith</u>, 121 F.3d at 1327); <u>see</u> <u>Mainero</u>, 164 F.3d at 1205 n.6. "The rule of non-inquiry is based on the principle that the Secretary of State's exercise of discretion regarding whether to extradite an individual may be based not only on 'considerations individual to the person facing extradition' but 'may be based on foreign policy considerations instead.'" <u>Prasoprat</u>, 421 F. 3d at 1016 (quoting <u>Lopez-Smith</u>, 121

---

<u>Cornejo-Barreto</u>, 218 F.3d at 1011 (quoting the Convention Against Torture, art. 3). The Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act") implemented Article 3 of the Convention Against Torture by stating that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . . " <u>Cornejo-Barreto</u>, 218 F.3d at 1011 (quoting FARR Act, Pub.L. No. 105-277, § 2242, 112 Stat. 2681 (Oct. 21, 1998)). Pursuant to the FARR Act, the Department of State also adopted implementing regulations. See <u>Cornejo-Barreto</u>, 218 F.3d at 1011-2012; 22 C.F.R. §§ 95.1 <u>et seq.</u>

F.3d at 1326); <u>see</u> <u>Emami</u>, 834 F.2d at 1454 ("The need for flexibility in the exercise of Executive discretion is heightened in international extradition proceedings which necessarily implicate the foreign policy interests of the United States.") (quoting <u>Escobedo v. United States</u>, 623 F.2d 1098, 1105 (5th Cir. 1980)).

The Ninth Circuit has, "on occasion, cited the possibility of a humanitarian exception to extradition," but has never relied on that theoretical possibility to deny a request for extradition. <u>Prasoprat</u>, 421 F. 3d at 1016 (citing <u>Mainero</u>, 164 F.3d at 1210; <u>Cornejo-Barreto</u>, 218 F.3d at 1010; <u>Lopez-Smith</u>, 121 F.3d at 1326-1327). In <u>Prasoprat</u>, moreover, the Ninth Circuit flatly declined to create or apply a humanitarian exception. <u>Prasoprat</u>, 421 F.3d at 1016 (holding that the extradition magistrate "did not have the authority to refuse to issue a certificate of extradition on humanitarian grounds").[14]

The rule of non-inquiry bars consideration of Munoz's contentions regarding his treatment upon extradition, and application of a humanitarian exception is unwarranted.

///

---

[14] The Ninth Circuit has held that federal courts have jurisdiction to review a claim that the Secretary of State violated her "non-discretionary" duty under the FARR Act not to surrender a person when there are substantial grounds for believing the person would be in danger of being subjected to torture, and that "[c]ourts reviewing such petitions will be required to set aside the Secretary's extradition decisions if they are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Cornejo-Barreto</u>, 218 F.3d at 1014-1015 & n.10 (quoting 5 U.S.C. § 706(2)(a)).

In a subsequent unpublished decision, the Ninth Circuit rejected the contention that <u>Cornejo-Barreto</u> cannot be reconciled with <u>Munaf v. Geren</u>, 553 U.S. 674 (2008), in which the Supreme Court "explained that the decision of the Executive Branch to surrender a detainee . . . is a matter that should be addressed by the Executive Branch rather than the Judicial Branch." <u>Trinidad y Garcia v. Benov</u>, 395 Fed.Appx. 329, 331 (9th Cir. 2010) (citing <u>Munaf</u>, 553 U.S. at 701-704). In <u>Trinidad y Garcia</u>, the Ninth Circuit said that <u>Cornejo-Barreto</u> "remains good law" because in <u>Munaf</u>, the Supreme Court "specifically declined to address whether the Court would have jurisdiction to review a habeas petition raising a FARR Act claim." <u>Trinidad y Garcia v. Benov</u>, 395 Fed.Appx. at 331.

**Findings of Fact and Conclusions of Law Regarding Extraditability**

1.      This court possesses subject matter jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. § 3184.

2.      This court possesses personal jurisdiction over Jose Luis Munoz Santos.

3.      A valid Extradition Treaty exists between the United States and Mexico.

4.      The Extradition Treaty between the United States and Mexico is, and at all relevant times has been, in full force and effect.

5.      Jose Luis Munoz Santos has been charged by Mexico with a criminal offense within its jurisdiction.

6.      The offense with which Jose Luis Munoz Santos has been charged is an extraditable offense under the Extradition Treaty between the United States and Mexico.

7.      The person before the court is the same person who is sought for prosecution in the request for extradition.

8.      The request for extradition contains competent evidence establishing probable cause to believe that Jose Luis Munoz Santos committed the charged offense of kidnapping.

///

///

///

**Certification of Extraditability and Order for Commitment**

Pursuant to 18 U.S.C. § 3184, the court certifies to the Secretary of State of the United States of America that Jose Luis Munoz Santos is extraditable to Mexico with respect to the offense of kidnapping described in the government's extradition request.

**IT IS SO ORDERED.**

June 13, 2011



_____
ANDREW J. WISTRICH
United States Magistrate Judge